## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**MEDIANEWS GROUP, INC. and
CHARLESTON PUBLISHING
COMPANY,**
      **Petitioners,**

**v.**                               **Civil Action No. 2:17-cv-03921**
                                                   **Judge Johnston**

**DAILY GAZETTE COMPANY and
DAILY GAZETTE HOLDING
COMPANY, LLC,**
      **Respondents**

## RESPONDENTS' ANSWER TO PETITIONERS' PETITION
## AND
## RESPONDENTS' COMBINED MOTION TO VACATE
## ARBITRATOR'S AWARD
## And MEMORANDUM IN SUPPORT THEREOF

### I.      ANSWER

Come now the Respondents and answer the Petitioners' Petition as follows:

1.  Respondents admit Paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 18 and 19 of Petitioners' Petition.

2.  Respondents deny paragraphs 15 and 17 of Petitioners' Petition.

## II    MOTION TO VACATE ARBITRATOR'S AWARD

Respondents move to vacate the Arbitrator's award on the grounds that the Arbitrator made significant errors of law and, as a result, arrived at a judgment that is contrary to the law of West Virginia and completely inequitable.

### 1.  The Contractual Right to Appeal the Arbitrator's Award

This is <u>not</u> a standard Federal Arbitration Act case where the grounds for appealing the arbitrator's award are severely limited by the statute. As the courts have frequently pointed out, arbitration always arises out of a contract between the parties; therefore, it is the <u>contract</u> between the parties that governs the procedural rights in the arbitration that is authorized by the contract.

The contractual provision under which this case was arbitrated may be found as Exhibit A to the Amended and Restated Joint Operating Agreement, which entire Agreement has been filed by the Petitioners as their Exhibit 3. The relevant contractual provision allowing appeals on <u>all</u> matters of law to this Honorable Court is found in section C and reads in relevant part as follows:

> In all Major Disputes, the parties shall, in addition to the limited statutory right to seek vacation or modification of any Award pursuant to applicable law, have the right to seek vacation or modification of any Award that is based in whole, or in part, on an incorrect or erroneous ruling of law by appeal to an appropriate court having jurisdiction; provided, however, that any application for vacation or modification of an Award based on an incorrect ruling of law must be filed in a court having jurisdiction pursuant to clause (c ) below within thirty (30) days from the date the Award is rendered.

### 2.  The Arbitrator's Specific Legal Errors.

#### *a. The Sale of the URL was Fully within the Contemplation of the Contract*

In this case it is well worth going back to some basics of contract law, specifically the legal axiom that when a contract is "ambiguous," a court will attempt to interpret it in accordance with the intention of the parties, as is clearly articulated in *Coleman v. Sopher*, 201 W. Va. 588, 598-99 (1997) with authorities as follows:

> Extrinsic evidence may be used to aid in the construction of a **contract** if the matter in controversy is not clearly expressed in the **contract**, and in such case the **intention of the parties** is always important and the court may consider parole evidence in connection therewith with regard to conditions and objects relative to the matter involved. . . ." Syl. Pt. 2, *Berkeley Co. Pub. Ser. Dist. v. Vitro Corp. of America*, 152 W. Va. [252], [162 S.E.2d 189 (1968)].['] Syllabus Point 2, *International Nickel Co. v. Commonwealth Gas Corp.*, 152 W. Va. 296, 163 S.E.2d 677 (1968)." Syllabus Point 2, *Bittorf v. Bittorf*, 182 W. Va. 594, 390 S.E.2d 793 (1989).

Therefore, as the following analysis will clearly show, the "reversionary" interest of Petitioner MediaNews in the *Daily Mail's* intellectual property, particularly the domain name "*DailyMail.com,*" created no impairment to the sale of that domain name according to the specific wording of the reversionary provision.

It was admitted numerous times during the hearing in this case that virtually the exclusive purpose of both the Limited Partnership Agreement and the Joint Operating Agreement (JOA) was to satisfy the Justice Department. In this regard, there are three compelling pieces of evidence: First, there is the letter from Dean Singleton to Betty Chilton dated 29 December 2003 (Exhibit 60) advising of the offer of $55 million from Ogden for the *Daily Mail* and setting forth three possible responses by the *Gazette* owners as per their right of first refusal: (1) buy the *Mail* from MediaNews; (2) sell the

*Gazette* to MediaNews for $60 million; or (3) sell control of the *Gazette* to MediaNews. In both the scenario where the *Gazette* bought the *Mail*, or MediaNews bought the *Gazette*, Mr. Singleton pointed out that certain cosmetic gestures would be necessary to keep the Department of Justice at bay. Indeed, Mr. Singleton suggested that if MediaNews bought the *Gazette*, then MediaNews would be required to sell the *Daily Mail* masthead to Sam Hindman, the hired editor of the *Mail* at that time. The flavor of the offer may be found on the second page of the exhibit in the second paragraph:

> A second possibility would be for MediaNews to purchase all of the Daily Gazette Company's interests in Charleston Newspapers, the <u>Gazette</u> and <u>Sunday Gazette-Mail</u>, for which MediaNews is prepared to pay $60,000,000…. In that circumstance, to expedite compliance with the Newspaper Preservation Act, MediaNews would intend concurrently to sell Sam Hindman the <u>Daily Mail</u> masthead, and enter into an agreement with Sam regarding the continued editorial independence and future publication of the <u>Daily Mail.</u>

The second piece of evidence concerning the intent of the parties may be found on Exhibit B to the *Limited Partnership Agreement for Charleston Newspaper Holdings, L.P. a Delaware Limited Partnership* dated 7 May 2004 and found as Exhibit 95 to the Hearing. This little Exhibit B shows that the **total** capital contribution to the partnership by MediaNews was $1.00. This representation, which must have had some repercussions with regard to tax accounting, etc., reflects the fact that the reversionary interest in any intellectual property, specifically including the domain name *DailyMail.com,* had no recognizable market value.

The final piece of evidence concerning what was "intended" by the provisions of the JOA that are at issue in this case is the testimony of Dean Singleton in his deposition that the only purpose of the JOA was to satisfy the DOJ, and that the only reason for

retaining the masthead of the *Daily Mail* and related intellectual property was so that at

the end of the JOA, the owner of the masthead could, if he, she or it wanted, begin

publication of the *Daily Mail* again as a separate paper. Mr. Singleton, in this regard,

said:

> Q    Well, I agree with that.  But I assume from the tone of this
> letter, that if you had sold the Daily Mail to Ogden, Ogden
> would have taken everything, including the masthead and the
> intellectual property and everything else?
>
> A    Very likely.
>
> Q    Right.
>
> A    Because we did not negotiate a purchase agreement you
> can't say that, but very likely that would have been the case.
>
> Q    Yes.  That's because the masthead and the name and
> everything was part and parcel of the newspaper that someone was
> buying; is that right?
>
> A    That's correct.
>
> Q    Okay.  When you actually sold everything having to do
> with the Daily Mail except the masthead and a couple of other parts of
> intellectual property, including the domain name, to The Charleston
> Gazette or the Charleston Daily Gazette Company, the purpose of
> retaining the intellectual property, I assume, was not primarily
> economic or even tangentially economic but was for the purpose of
> meeting the requirements of the Department of Justice with regard to
> the Newspaper Preservation Act; is that right?
>
> A    Well, it was that and more.  I mean when the JOA would
> have expired in 2024 and the Department of Justice would have
> required but we also would have wanted, that when the JOA expired,
> if it were not renewed, we wanted the name and the intellectual
> property and the URL so that we could continue to publish outside the
> JOA, if we chose to do that.
>
> Q    I see.  So it was a --
>
> A    I mean the Department of Justice would require that but
> the reason they would require that is they wanted to preserve the right

of the newspaper to publish after the JOA expired.

It must be remembered that Charleston Newspapers Holdings, L.P. was (and is) a Delaware limited partnership, and it was the partnership that owned all of the assets of both the *Gazette* and the *Mail*. At the time the URL "*DailyMail.com*" was sold, namely May, 2013, both the *Gazette* and the *Mail* were being published separately five days a week with combined editions on weekends. Furthermore, as exhibits and testimony at the hearing clearly revealed, there was NO intention at the time the URL was sold to consolidate the papers. It was management's intention to comply with the Newspaper Preservation Act by adopting the "Section A" option by which both papers would continue to be published, but with only the editorial section, namely Section A, being different.

The Arbitrator has made great moment of the fact that at the time of the sale of the URL, United Bank had not declared a default. But the evidence clearly shows that Daily Gazette Co. was in default: Since when is it necessary for the Bank to "declare" a default when the Bank and the customer are working either to cure the default or renegotiate terms. The truth of the matter is that Daily Gazette Co. was in default at the time they needed to sell the *Daily Mail* URL in order to prevent the Bank from formally declaring a default.

This, then, brings us to the actual wording of the Joint Operating Agreement relating to the reversion of the masthead and URL

"*DailyMail.com*" at the end of the JOA that was at issue in the arbitration. That specific clause provides:

> Upon liquidation the partnership is to distribute to CPC the *Mail* masthead, all trademarks, copyrights, trade names, service names and service marks of the *Mail*, subscriber and advertiser lists, print and electronic archives of the *Mail*, associated websites and URLs (including "dailymail.com") and all legal rights associated with these assets, **subject to such dispositions, additions or substitutions relating thereto which may have occurred in the ordinary course of the operations of the Partnership or the Joint Venture subsequent to the date hereof**. . . ." (Partnership Agreement §7.3.2.) [Emphasis added.]

First and foremost, <u>all</u> of the proceeds received from the sale of the *Daily Mail. Com* URL were devoted to the operation of the Partnership. The <u>Partnership</u> owed United Bank over $21 million and $1 million of the sale proceeds went to reduce the loan balance. That, then, reduced the <u>Partnership's</u> liability by $1 million, but more importantly, it potentially freed up $1 million in additional credit for such things as the modification of the Web press to reduce the Web width from 50 inches to 44 inches and thereby save about $250,000 a year in newsprint.

Furthermore, given Mr. Singleton's testimony above that the <u>object</u> of the reversionary agreement in the JOA was to allow the *Daily Mail* to be published as a separate paper at the end of the JOA, the substitution of the URL "*CharlestonDailyMail.com*" for "*DailyMail.com*" did no violence to the intention of the parties because there was no loss of Website readership attendant upon the change in the URL. *See*, Hearing Testimony of Marshall Anstandig, pp. 116-17; Testimony of Trip Shumate, pp. 191-192. Indeed, a

seamless transition was negotiated with the *Daily Mail* of London to allow the continued use by the JOA of the URL *DailyMail.com* while the readers got used to the new web address.

The $500,000 that the United Bank allowed the Partnership to keep was then dedicated to two <u>Partnership</u> purposes: (1) the purchase and installation of a new content management system for <u>both</u> papers; and, (2) the purchase of new camera equipment for <u>both</u> the *Gazette* and the *Mail*. Quite obviously, had the Partnership waited until 2024 to sell the URL, it would have been no more valuable than the URLs "*NeelyCallaghan.com*" or "*KingBallow.com*."

Therefore, the sale of the URL was a matter of some urgency, both because the URL might become worthless if the London *Daily Mail* adopted some other catchy URL, and because the <u>Partnership</u> desperately needed working capital. Therefore, because every dime received for the sale went directly toward capital equipment for the <u>partnership,</u> and $1 million in partnership debt reduction (because that was the Bank's condition for releasing its security interest) the sale was completely proper as an action in the best interest of the Partnership as a business entity.

Therefore, the Arbitrator made a clear error in the application of the contract law of West Virginia in that our courts, in the event of an ambiguity, always look to the intention of the parties, and the language of the reversionary clause clearly permitted "substitution" in the course of the

business as required by the needs of the partnership.

**b. *The Contract Doctrine of "Impossibility" Precludes the Arbitrator's Holding that the* Gazette *is Liable for Payments until 2024***

The Respondents in this case, namely The Daily Gazette Company, used best efforts to continue the partnership and publish both papers by offering to adopt what was called "the Section A option." Under this scheme, both papers would be published, but only the first section, namely Section A, would be different in any way. However, Claimants made this impossible by demanding that Respondents agree to reimburse Claimants as much as $1.3 million in attorneys' fees and expenses if the DOJ caused trouble. The financial records in this case, along with Exhibits at Tab 55 (graphs of circulation, advertising revenue and total revenue) conclusively show that the Partnership could not possibly have subsidized Claimants' attorneys' fees, particularly because Claimants apparently insisted on using Hughes Hubbard in New York City, one of the most expensive law firms in the World.

As it turned out, in or about the beginning of 2015 when undersigned counsel became the Daily Gazette Company's general counsel, undersigned counsel understood enough about anti-trust law to realize that before the intricacies of the Newspaper Preservation Act needed to be addressed, there must be a potential Clayton Act §7 violation, and as per Exhibit 27, counsel's letter to David Kully, Esq. in the anti-trust division of DOJ, it was

and is counsel's position that circumstances have so changed in the entire media business that there could be no §7 violation in West Virginia.

Furthermore, also in Exhibit 27 is undersigned counsel's letter to Ethan Litwan at Hughes Hubbard, in which undersigned counsel explains that it is not possible for the Daily Gazette Company to gather wool whilst the DOJ dithered and equivocated:

> I have concluded that the aspect that most characterizes the DOJ is indecisiveness: all bureaucracies are inherently risk-adverse, so doing nothing offers the lowest risk path among all alternatives. Therefore, it is my intention to tell the DOJ that if they cannot accept with equanimity a decision that is essential to the Charleston Newspapers' survival, then they must bring their action for a TRO forthwith. Prolonged discussions and negotiations will inevitably take us to court anyway because, as you well understand and as I have explained at length in the letter, there is really no alternative to the path that I have adumbrated.

> I have concluded that the DOJ will not succeed in establishing the *prima facie* case they must establish in order to get an injunction. When I avail myself of the wonderful Federal Court audio-visual technology and flash up in front of the judge the Web pages from WCHS, WOWK and WSAZ showing coverage identical to the *Gazette* and the *Mail*, I shall have proved my point. Furthermore, TV Web pages are free!!

As counsel indicated both to the DOJ and the counsel for Claimants, there was no realistic possibility of keeping both papers operating.

Claimants sought and the Arbitrator awarded Claimants' their annual contract fee under the JOA up until 2024; however, this claim is defeated by the contract doctrine of "impossibility," as that term is used in the *Restatement (Second) of Contracts. See, e.g., Restatement (2d) Contracts* 261, 265. It is, and would have been, impossible to publish two entirely separate papers even for one more year without filing for bankruptcy as

exhibits showing the decline in advertising revenue, circulation revenue and total EBITA

(Exhibit 55) clearly show. The West Virginia law is clear:

> Under the **doctrine** of impracticability, a party to a **contract** who claims that a
> supervening event has prevented, and thus excused, a promised performance must
> demonstrate each of the following: (1) the event made the performance
> impracticable; (2) the nonoccurrence of the event was a basic assumption on
> which the **contract** was made; (3) the impracticability resulted without the fault of
> the  party seeking to be excused; and (4) the party has not agreed, either expressly
> or impliedly, to perform in spite of impracticability that would otherwise justify
> his nonperformance.

Syl. Pt. 2, *Waddy v. Riggleman*, 216 W. Va. 250 (2004). Certainly, the Respondents met

all of the functional criteria established by the West Virginia Supreme Court of Appeals

for excuse of performance because of impossibility. And, of course, the "supervening

event" was actually two specific events: First, since the i-phone was introduced in 2010,

there has been a surge in "electronic media" that has caused a  realignment of advertising

budgets with advertisers seeking outlets different from traditional daily newspapers.

Second, the economy of Southern West Virginia has virtually collapsed; more than half

the store fronts of downtown Charleston are empty, the coal mines have closed, and the

price of oil and gas has made exploration and exploitation of our oil and gas resources

uneconomical. Businesses like Sears that once advertised heavily have left and smaller

retailers have closed or reduced their advertising budgets.  Therefore, the *Gazette's* gross

receipts have consistently gone down from 2010 onwards.

**WHEREFORE,** Respondents pray that this Honorable Court vacate the decision

of the Arbitrator and remand for further consideration consistent with this Honorable

Court's ruling.

Respectfully submitted
Respondents, by counsel

/s/*Richard Neely*_____
Richard Neely, WVSB #2709
Michael O. Callaghan, WVSB 5509
**NEELY & CALLAGHAN**
159 Summers Street
Charleston, WV 25301
304-343-6500 voice
304-343-6528 fax
RNeely@NeelyCallaghan.com


CERTIFICATE OF SERVICE

I hereby certify that the foregoing Answer and Motion of Respondents to Vacate the
Award of the Arbitrator was filed with the Clerk of the U.S. District Court using the
CM/ECF electronic filing system and said document will be served electronically upon
all counsel of record, to-wit:

Steven L. Thomas (WVSB #3738)
Thomas H. Ewing (WVSB #9655)
Courtney A. Kirtley (WVSB #9414)
Kay Casto & Chaney PLLC
P. O. Box 2031
Charleston, West Virginia 25327
(304) 345-8900 / telephone
(304) 345-8909 / fax
sthomas@kaycasto.com

And that copies have been sent by counsel electronically to:

Steven C. Douse, Esq.
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201

**sdouse@kingballow.com**

Edward D. McDevitt, Esq.
1210 Colonial Way
Charleston, WV 25314

**Eddmcdevitt@GMail.com**

Page **12** of **13**

on this 21st day of September, 2017.

/s/*Richard Neely*_____
    Richard Neely