**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**


**MEDIANEWS GROUP, INC. and
CHARLESTON PUBLISHING
COMPANY,**

          **Petitioners,**

**v.**                                 **Civil Action No. 2:17-cv-03921
(Judge Johnston)**

**DAILY GAZETTE COMPANY and
DAILY GAZETTE HOLDING
COMPANY, LLC,**

          **Respondents.**


**PETITIONERS' COMBINED (i) RESPONSE IN OPPOSITION TO RESPONDENTS'
MOTION TO VACATE ARBITRATOR'S AWARD AND (ii) MEMORANDUM IN
SUPPORT OF MOTION TO CONFIRM ARBITRATOR'S AWARD**

Petitioners, MediaNews Group, Inc. and Charleston Publishing Company (collectively "Petitioners"), by and through their undersigned counsel, submit the following Response in Opposition to *Respondents' Combined Motion to Vacate Arbitrator's Award and Memorandum in Support Thereof* ("Motion to Vacate") [Doc. # 8] and in support of their *Motion to Confirm Arbitrator's Award*.[1]


**I.**     **BACKGROUND**

On or about July 23, 2010, Petitioner Charleston Publishing Company ("CPC")[2] and Respondent, Daily Gazette Holding Company, LLC ("DGHC") entered into an Amended and

---

[1]     A copy of the Final Arbitration Award ("Award") is attached to the *Petition for Order Confirming Arbitration Award* ("Petition") [Doc. # 2] as Exhibit 1, is incorporated herein by reference, and is referred to herein as **Exhibit 1**.

[2]     CPC is a wholly owned subsidiary of Petitioner MediaNews Group, Inc., d/b/a Digital First Media ("MediaNews").

Restated Limited Partnership Agreement (the "LPA") for Charleston Newspaper Holdings, L.P.[3] Pursuant to the terms of the LPA, CPC is the sole limited partner, and DGHC is the sole general partner in Charleston Newspaper Holdings, L.P. Also on July 23, 2010, Petitioner CPC and Respondents Daily Gazette Company ("DGC") and DGHC entered into a Second Amended and Restated Joint Operating Agreement ("the JOA").[4] The LPA provides that the partnership exists to manage a joint venture, Charleston Newspapers, pursuant to the JOA. (See **Exhibit 2**, Recitals and ¶¶ 1.1.23, 2.4). Section 9.10 of the LPA provides, in pertinent part, that "[t]his Agreement, together with the JOA and the Warrant, constitute the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements (oral and written) and understandings pertaining thereto." (See id. ¶ 9.10).

Section VII(P) of the JOA states that "[t]he terms of Exhibit A attached hereto, which include provisions relating to procedures pursuant to which the parties shall resolve any disputes, claims or controversies arising under, out of or in connection with this JOA are incorporated herein by reference as if set out herein in full." (See **Exhibit 3**, § VII (P)). Exhibit A to the JOA (hereinafter the "Arbitration Agreement") sets forth the alternative dispute resolution protocol, and states that its terms apply to "[a]ny dispute, claim or controversy arising under, out of, in connection with or relating to this JOA, or any course of conduct, course of dealings, statements (oral or written), or actions of any party related to the JOA, including any claim based on or arising from an alleged tort . . ." (See id. at Exhibit A). The Arbitration Agreement further provides, in pertinent part, that:

---

[3] A copy of the LPA is attached to the Petition as Exhibit 2, is incorporated herein by reference, and is referred to herein as **Exhibit 2**.

[4] A copy of the JOA is attached to the Petition as Exhibit 3, is incorporated herein by reference, and is referred to herein as **Exhibit 3**.

(a) (ii) (H) . . . the result of the arbitration will be binding on the parties, and judgment on the arbitrator's Award may be entered in a court designated in clause (c) below.

* * *

(c)   WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING RELATING TO ANY AWARD . . . EACH PARTY IRREVOCABLY (1) <u>CONSENTS AND SUBMITS TO THE EXCLUSIVE JURISDICTION OF ANY UNITED STATES FEDERAL COURT OR WEST VIRGINIA STATE COURT SITTING IN THE CITY OF CHARLESTON IN THE STATE OF WEST VIRGINIA</u>, (2) WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN SUCH COURT, (3) WAIVES ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM, (4) WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO ANY SUCH CLAIM, SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT, THAT SUCH COURT DOES NOT HAVE JURISDICTION OVER THE PARTY, AND (5) WAIVES ALL RIGHT TO TRIAL BY JURY.

(<u>Id.</u> at <u>Exhibit A</u>, at pages 3-4) (emphasis added).  In the Motion to Vacate, Respondents do not dispute the validity of the Arbitration Agreement or the applicability of the Arbitration Agreement to the facts in this case.[5]

Subsequent to July 23, 2010, a dispute arose among the parties, and Petitioners claimed breaches of the LPA and JOA by Respondents, as well as breaches of fiduciary duty and civil conspiracy.  Pursuant to the Arbitration Agreement, the parties submitted the dispute to arbitration with Edward D. McDevitt (the "Arbitrator"), who held a full final hearing on April 12, 2017.  The matter was submitted to the Arbitrator on a written and prepared transcript, and both parties submitted post hearing briefs, which were considered by the Arbitrator.

---

[5]      Petitioners initially filed a Complaint in the Court of Chancery of the State of Delaware, and Respondents successfully moved to dismiss that Complaint based on the enforceability of the Arbitration Agreement.

Thereafter, on August 28, 2017, having permitted substantial pre-hearing discovery; held a full hearing on the merits; reviewed and evaluated extensive documentary evidence; and accepted post-hearing submissions, the Arbitrator entered the Award. (See **Exhibit 1**). The Award awards Petitioners $3,795,000.00, plus interest at the post-judgment rate from the date of the Award. Thereafter, on or about September 5, 2017, Petitioners initiated this case by filing their Petition for Order Confirming Arbitration Award [Doc. #2] (the "Petition"). Respondents filed the Motion to Vacate on September 21, 2017 [Doc. # 8], within the thirty days required under the Arbitration Agreement.

In the Motion to Vacate, Respondents challenge various alleged legal errors by the Arbitrator in the Award. Section (a)(ii)(C) of the Arbitration Agreement provides, in relevant part:

> In all Major Disputes, the parties shall, in addition to the limited statutory right to seek vacation or modification of any Award pursuant to applicable law, have the right to seek vacation or modification of any Award that is based in whole, or in part, on an incorrect or erroneous ruling of law by appeal to an appropriate court having jurisdiction; provided, however, that any application for vacation or modification of an Award based on an incorrect ruling of law must be filed in a court having jurisdiction pursuant to clause (c) below within thirty (30) days from the date the Award is rendered. ***The findings of fact made by the arbitrators shall be binding on all parties and shall not be subject to further review except as otherwise allowed by applicable law***.

**(Exhibit 3,** at Exhibit A, § (a)(ii)(C)) (emphasis added). Specifically, Respondents claim that the Award should be vacated because the Arbitrator made a legal error in deciding that Respondents sold the URL "dailymail.com" in violation of the parties' agreements and by not finding that Respondents were excused from payment of the management fee under the doctrine of impossibility (impracticability). (See generally Motion to Vacate).

Petitioners request that the Court deny the Motion to Vacate and instead grant their Motion to Confirm Arbitration Award filed contemporaneously herewith pursuant to 9 U.S.C. §

9 based on Respondents' failure to meet their burden of showing that the Award should be vacated under 9 U.S.C. § 10.

## II.     <u>STANDARD OF JUDICIAL REVIEW FOR THE AWARD</u>

Pursuant to 9 U.S.C. § 9, the court **must** grant an application to confirm an arbitration award "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of the [Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10-11]. <u>The Sheet Metal Workers Int'l Ass'n v. Beckley Mechanical, Inc.</u>, 803 F.Supp.2d 511, 516 (S.D.W.Va.2011). The Fourth Circuit recently summarized the standards applicable to judicial review of an arbitrator's decision as follows:

> "In order for a reviewing court to vacate an arbitration award, the moving party must sustain the heavy burden of showing one of the grounds specified in the [FAA] or one of certain limited common law grounds." The grounds for vacating an arbitral award specified in the FAA are: "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct ...; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."[6]

---

[6] The procedures and grounds for vacating an arbitrator's award are set forth in § 10 of the Federal Arbitration Act ("FAA"). Section 10 states:

(a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration--
    (1) where the award was procured by corruption, fraud, or undue means;
    (2) where there was evident partiality or corruption in the arbitrators, or either of them;
    (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
    (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
(b) If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators.
(c) The United States district court for the district wherein an award was made that was issued pursuant to section 580 of title 5 may make an order vacating the award upon the application of a person, other than a party to the arbitration, who is adversely affected or aggrieved by the award, if the use of arbitration or the award is clearly inconsistent with the factors set forth in section 572 of title 5.

9 U.S.C. § 10.

. . . .

> "Judicial review of an arbitration award in federal court is substantially circumscribed." In fact, "the scope of judicial review for an arbitrator's decision is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all — the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." "A court sits to determine only whether the arbitrator did his job — not whether he did it well, correctly, or reasonably, but simply whether he did it."

PNGI Charles Town Gaming, L.L.C. v. Mawing, 603 Fed. App'x 137, 137-38 (4th Cir. 2015) (internal citations omitted) (unpublished case); see also Elkland Holdings LLC v. Eagle Mining LLC, No. 2:14-CV-15043, 2015 WL 13037115, at *7 (S.D.W. Va. July 29, 2015).

> Moreover, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." Therefore, on judicial review, an arbitration award "is entitled to a special degree of deference."

Sheet Metal Workers Int'l Ass'n, Local Union No. 33, 803 F. Supp. 2d at 515–16 (citations omitted).

## III.   ARGUMENT

### A.   The Scope of Review Is Limited To The Question of Whether There Has Been A "'Material Disregard of the Law" By The Arbitrator.

Respondents argue in their Motion to Vacate that this is not a standard FAA case because, in their view, the contract expands the grounds for appeal otherwise allowed. The Respondents do not cite to any specific grounds from Section 10 of the FAA in support of their Motion to Vacate. Instead, the Respondents rely solely upon language in Exhibit A to the JOA, which provides the right to seek vacation or modification based on an incorrect or erroneous ruling of law.

Assuming, *arguendo*, that the contract language was intended to expand the scope of judicial review, it is well-established that parties to an arbitration contract cannot as a matter of

law expand the scope of judicial review beyond the enumerated grounds in the FAA.  In Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008), the United States Supreme Court considered whether parties to a contract could expand judicial review of an arbitration award beyond the enumerated grounds in the FAA.  In that case, the arbitration agreement allowed judicial review for plain legal errors although no such provision exists as a ground for review under the FAA.   See id. at 586.  The Supreme Court ultimately determined that sections 10 and 11 of the FAA "provide exclusives regimes for the review provided by the statute." Id. at 590; see id. at 584.   In other words, parties cannot expand the grounds for vacatur by contract.

Since Hall Street, courts have struggled with whether the "manifest disregard" of the law standard survives as a ground for review beyond the statutory grounds.  The Fourth Circuit recently recognized the uncertainty, but continues to recognize "manifest disregard" of the law standard as a ground for vacatur.  See Mawing, 603 Fed. App'x at 138 n.1 ("In the wake of the Supreme Court's decision in Hall Street, this court has recognized that considerable uncertainty exists 'as to the continuing viability of extra-statutory grounds for vacating arbitration awards.'") (internal citations omitted)); Jones v. Dancel, 792 F.3d 395, 401 (4th Cir.), cert. denied, 136 S. Ct. 591, 193 L. Ed. 2d 470 (2015) ("After the decision in Hall Street, we further have clarified that an arbitration award may be vacated when the arbitrator "manifestly disregards" the law."); Wachovia Sec., LLC v. Brand, 671 F.3d 472, 483 (4th Cir. 2012) ("We do not read Hall Street or Stolt–Nielsen as loosening the carefully circumscribed standard that we had previously articulated for manifest disregard.  Whether manifest disregard is a "judicial gloss" or an independent ground for vacatur, it is not an invitation to review the merits of the underlying

arbitration."). This Court recently recognized that the "manifest disregard" standard of review remains viable in the Fourth Circuit. See Elkland Holdings LLC 2015 WL 13037115, at *7.

Other courts, including the Supreme Court of Appeals of West Virginia, have taken a different position. The Supreme Court of Appeals of West Virginia recently held that "[m]anifest disregard of the law is not recognized as a valid statutory basis for challenging an arbitration award made pursuant to the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1– 16 (2012). See Syl. Pt. 1, Cunningham v. LeGrand, 237 W. Va. 68, 785 S.E.2d 265, 266 (2016). However, for purposes of the present case, the Fourth Circuit's continued use of the "manifest disregard" standard is controlling. See Elkland Holdings LLC, 2015 WL 13037115, at *7 (applying the standard); see also Mendel v. Morgan Keegan & Co., Inc., 654 F. App'x 1001, 1004 (11th Cir.), cert. denied, 137 S. Ct. 407, 196 L. Ed. 2d 297 (2016) (applying Erie doctrine and holding that "[w]hile the Alabama Supreme Court was entitled to interpret the FAA for the benefit of its lower state courts, it had no power to contravene our interpretation in the federal courts as well."). Therefore, to the extent the Court can examine the Arbitrator's Award, the applicable standard of review must be "manifest disregard" of the law as adopted by the Fourth Circuit, and not "plain error."

**B.** **The Court Must Deny The Motion To Vacate And Instead Confirm The Arbitration Award Under 9 U.S.C. § 9 Because The Arbitrator Did Not Manifestly Disregard Applicable Law.**

In Wachovia Sec., LLC v. Brand, 671 F.3d 472, 483 (4th Cir. 2012), the Fourth Circuit explained the two-part test for "manifest disregard" of the law as follows: "(1) the applicable legal principle is clearly defined and not subject to reasonable debate; and (2) the arbitrator[ ] refused to heed that legal principle." This, however, "is not an invitation to review the merits of the underlying arbitration. Id. "A court sits to determine only whether the arbitrator did his job-

not whether he did it well, correctly, or reasonably, but simply whether he did it." Id. at 478.  "A 'manifest disregard of the law' is established when it is shown that the arbitrator, in making his ruling, was 'aware of the law, understood it correctly, found it applicable to the case before [him], and yet chose to ignore it in propounding [his] decision.'" Elkland Holdings LLC 2015 WL 13037115, at *10 (citations omitted).

1. **As to the Sale of the URL "dailymail.com," the Arbitrator Interpreted the Parties' Contract and Determined that Petitioners Wanted Certain Assets for Future Use and the Sale of the URL Was Not in the Ordinary Course of Business.**

Here, Respondents bear the steep burden of establishing that the Arbitrator manifestly disregarded the law.  Respondents fall far short of meeting this burden because their argument is really nothing more than a disagreement as to the Arbitrator's findings of fact and interpretation of the applicable contract.  See Weirton Med. Ctr., Inc. v. QHR Intensive Res., LLC, No. 5:15CV131, 2016 WL 2766650, at *4 (N.D.W. Va. May 12, 2016), amended, No. 5:15CV131, 2016 WL 4435242 (N.D.W. Va. Aug. 19, 2016), and aff'd, 682 Fed. App'x 227 (4th Cir. 2017) ("Thus, the arbitrator did not fail to apply West Virginia contract interpretation principles. Rather, WMC simply disagreed with the arbitrator's interpretation of the contract."). Respondents argue that the controlling contract was "ambiguous" and that Petitioners' reversionary interest in the URL name "dailymail.com" did not prohibit Respondents from selling the domain name based on extrinsic evidence.  (Motion to Vacate at 3).[7]  In support of

---

[7]

      Under West Virginia law, "[a] contract is ambiguous when it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after applying the established rules of construction." Williams v. Precision Coil, Inc., 194 W.Va. 52, 459 S.E.2d 329, 342 (1995); see also Payne v. Weston, 195 W.Va. 502, 466 S.E.2d 161, 166 (1995) ("The term 'ambiguity' is defined as language 'reasonably susceptible of two different meanings' or language 'of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning.'" (quoting Shamblin v. Nationwide Mut. Ins. Co., 175 W.Va. 337, 332 S.E.2d 639, 640 (1985))).

this, Respondents cite various forms of extrinsic evidence in an effort to show that the purpose of the agreements between the parties was really just to satisfy the Justice Department.  (Id.).

The Arbitrator found that while Respondents maintained a right to substitute collateral, the "URL came burdened with a reverter in favor of the Claimant[s] and was subject to other restrictions on disposal."  (**Exhibit 1**, at 9).  Finding no ambiguity in the controlling documents, the Arbitrator held that "[i]t was ***clear from the documents*** that the Claimants bargained for and wanted certain specific assets for potential, maybe even speculative, future use."  (Id.) (emphasis added).  As the Arbitrator gleaned this purpose from the four corners of the controlling agreement, resort to extrinsic evidence is unnecessary and inappropriate.[8]

---

"[A] court should read ... provisions to avoid ambiguities and not torture the language to create them." Payne, 466 S.E.2d at 166. "As such, ambiguity does not result merely because the parties do not agree to the construction of the contract." Dytko v. Chesapeake Appalachia, LLC, Civil Action No. 5:13CV150, 2014 WL 2440496, at *3 (N.D.W.Va. May 30, 2014) (citing Lee v. Lee, 228 W.Va. 483, 721 S.E.2d 53, 56 (2011)). "Instead, the question as to whether a contract is ambiguous is a question of law to be determined by the courts." Id. (citing Pilling v. Nationwide Mut. Fire Ins. Co., 201 W.Va. 757, 500 S.E.2d 870, 872 (1997)); see also State ex rel. Richmond Am. Homes of W. Va., Inc. v. Sanders, 228 W.Va. 125, 717 S.E.2d 909, 924 (2011) ("Whether a contract is ambiguous is a question of law....").

U.S. ex rel. TBI Investments, Inc. v. BrooAlexa, LLC, 119 F. Supp. 3d 512, 536–37 (S.D.W. Va. 2015) (Johnston, J).

[8]     The Supreme Court of Appeals of West Virginia summarized the controlling principles of contract law as follows in Faith United Methodist Church & Cemetery of Terra Alta v. Morgan, 231 W. Va. 423, 443–44, 745 S.E.2d 461, 481–82 (2013):

When the language used is plain and unambiguous, courts are required to apply, not construe, the contract. "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." "The controlling factor in the interpretation of deeds, wills and contracts is the intention of the parties; and to arrive at that intention the whole instrument must be carefully scanned." "In the construction of a deed or other legal instrument, the function of a court is to ascertain the intent of the parties as expressed in the language used by them." Further guidance is provided in the principle that

In construing a deed, will, or other written instrument, it is the duty of the court to construe it as a whole, taking and considering all the parts together, and giving effect to the intention of the parties wherever that is reasonably clear and free from doubt, unless to do so will violate some principle of law inconsistent therewith.

The Arbitrator found that, despite Petitioners' refusal to consent to the sale of the domain name, Respondents took it upon themselves to sell the name believing consent was not required. (Id. at 9-10). In the proceedings below, Respondents argued that the right of substitution and the right to sell assets in the ordinary course of business justified the sale of the domain name. However, the Arbitrator found that the clear and unambiguous language of the controlling agreements provided otherwise. (Id. at 10-11).

The controlling provision of the LPA relied upon by the Arbitrator states as follows:

4.5.3 *Without the written consent of the Limited Partners*, or except as specifically authorized in this Agreement, the General Partner *may not*:

(a) Do any act in contravention of this Agreement, the JOA or the Certificate of Limited Partnership.

(b) Do any act that would make it impossible to carry on the ordinary business of the Partnership.

(c) Change the purposes of the Partnership as set forth in Section 2.4 hereof.

(d) Dissolve the Partnership.

(e) *Make any disposition of assets contributed by CPC to the Partnership on the date of the Prior Partnership Agreement that would impair the ability of the Partnership to make the terminating distributions to CPC that are contemplated by Section 7.3 hereof*[9] (provided no consent of the Limited Partners will be

---

"Extrinsic evidence will not be admitted to explain or alter the terms of a written contract which is clear and unambiguous." "If a writing is not ambiguous, it must speak for itself by its words, without aid of any oral evidence[.]""[T]he express language of the conveyance taken as a whole will overcome any supposed intention."
We have emphasized that courts cannot rewrite a contract or deed that plainly expresses the parties' intent:

It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them.

[9] This section states:

Upon liquidation the partnership is to distribute to CPC the Mail masthead, all trademarks, copyrights, trade names, service names and service marks of the Mail, subscriber and advertiser lists, print and electronic archives of the Mail, associated *websites and URLs (including "dailymail.com")* and all legal rights associated with these assets, *subject to such dispositions,*

required for any disposition of such assets pursuant to any foreclosure action of the Joint Venture's lenders).

(**Exhibit 2**, LPA, at § 4.5.3)(emphasis added).

Relying upon section 4.5.3(e), the Arbitrator determined that the sale of the domain name "dailymail.com" violated the parties' agreement, even with substitution of a new URL.. (**Exhibit 1**, at 11). The essential question under this section was whether the sale of the URL was "in the ordinary course." The Arbitrator decided that the sale of the URL was ***not*** in the ordinary course. (Id. at 11). Thus, without Petitioners' consent, which was not given, Respondents breached the contract by selling the URL.

As the foregoing demonstrates, the Arbitrator took great effort to construe the parties' agreement. Even if the contract was subject to a different interpretation, the Court may not substitute its interpretation for that of the Arbitrator. See Oxford Health Plans LLC v. Sutter, 133 S. Ct. 2064, 2070–71, 186 L. Ed. 2d 113 (2013) ("The potential for those mistakes is the price of agreeing to arbitration. As we have held before, we hold again: "It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." The arbitrator's construction holds, however good, bad, or ugly."). The Arbitrator did not fail to apply West Virginia contract interpretation principles; Respondents just disagree with his interpretation of the contract. "The manifest disregard standard is not an 'invitation to review the merits of the underlying arbitration,' or to establish that the arbitrator 'misconstrued' or 'misinterpreted' the applicable law.' Jones v.

_additions or substitutions relating thereto which may have occurred in the ordinary course of the operations_ of the Partnership or the Joint Venture subsequent to the date hereof. . . ."

(**Exhibit 2**, LPA, at § 7.3)(emphasis added).

<u>Dancel</u>, 792 F.3d 395, 402–03 (4th Cir.), cert. denied, 136 S. Ct. 591, 193 L. Ed. 2d 470 (2015).

Accordingly, Respondents have failed to show that the Arbitrator manifestly disregarded the law in making his ruling with respect to the sale of the URL.

**2.** **The Doctrine of Impossibility/Impracticability Did Not Apply to Relieve Respondents of Responsibility for Payments until 2024.**

In the Motion to Vacate, Respondents claim that Petitioners should not have been awarded their annual management fee under the JOA based on the doctrine of "impossibility." In support of this position, Respondents assert that "[i]t is, and would have been, impossible to publish two entirely separate papers even for one more year without filing for bankruptcy as exhibits showing the decline in advertising revenue, circulation revenue, and total EBITA clearly show." (Motion to Vacate, at 10-11). Respondents posit that the "surge in 'electronic media'" and the collapse of the economy in Southern West Virginia were supervening events causing the *Gazette's* gross receipts to consistently decrease since 2010. In other words, Respondents argue that they should be relieved of any obligation to pay the management fee because of market shifts and corresponding financial inability.

In <u>Waddy v. Riggleman</u>, the Supreme Court of Appeals of West Virginia adopted section 261 of the <u>Restatement (Second) of Contracts</u>, outlining the required elements of the defense of impracticability as follows:

> Under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance.

Syl. Pt. 2, 216 W. Va. 250, 252, 606 S.E.2d 222, 224 (2004).  Explaining that "impracticability"

"remains a difficult standard to meet," the Court further stated that the "'legal excuse is broader

than having to prove that something is impossible  . . . . While impracticability embraces

situations short of absolute impossibility, mere increase in difficulty is not enough.'"  Id. at 259,

231 (quoting 30 Williston on Contracts § 77:1, at 277-78).[10]

---

[10]     The comments to Restatement § 261 provide further guidance on this element.  Comments d and e, quoted
in Waddy v. Riggleman, are particularly relevant.

> Events that come within the rule stated in this Section are generally due either to "acts of God" or
> to acts of third parties.... Performance may be impracticable because extreme and unreasonable
> difficulty, expense, injury, or loss to one of the parties will be involved. A severe shortage of raw
> materials or of supplies due to war, embargo, local crop failure, unforeseen shutdown of major
> sources of supply, or the like, which either causes a marked increase in cost or prevents
> performance altogether may bring the case within the rule stated in this Section. Performance may
> also be impracticable because it will involve a risk of injury to person or to property, of one of the
> parties or of others, that is disproportionate to the ends to be attained by performance. However,
> "impracticability" means more than "impracticality." A mere change in the degree of difficulty or
> expense due to such causes as increased wages, prices of raw materials, or costs of construction,
> unless well beyond the normal range, does not amount to impracticability since it is this sort of
> risk that a fixed-price contract is intended to cover. Furthermore, a party is expected to use
> reasonable efforts to surmount obstacles to performance (see § 205), and a performance is
> impracticable only if it is so in spite of such efforts.

It is additionally explained, in Comment e to Section 261, that:

> It is sometimes said that the rule stated in this Section applies only when the performance itself is
> made impracticable, without regard to the particular party who is to perform. The difference has
> been described as that between "the thing cannot be done" and "I cannot do it," and the former has
> been characterized as "objective" and the latter as "subjective." This Section recognizes that if the
> performance remains practicable and it is merely beyond the party's capacity to render it, he is
> ordinarily not discharged, but it does not use the terms "objective" and "subjective" to express
> this. Instead, the rationale is that a party generally assumes the risk of his own inability to perform
> his duty. Even if a party contracts to render a performance that depends on some act by a third
> party, he is not ordinarily discharged because of a failure by that party because this is also a risk
> that is commonly understood to be on the obligor.

Id., 216 W. Va. at 259, 606 S.E.2d at 231 (quoting Restatement (Second) of Contracts § 261,
Cmts. d & e) (citations omitted).

.

In the Motion to Vacate, Respondents do not apply these elements to the facts of the case but merely assert that all of the functional criteria of the defense have been met. However, as demonstrated below, Respondents impracticability defense fails as a matter of law.

First, while Respondents complain that the rise of electronic media and the economic conditions in Southern West Virginia were supervening events making Respondents' performance under the JOA impossible (impracticable), the amendments to the LPA and the JOA show that parties acknowledged and understood these risks. Under Waddy v. Riggleman, one of the elements for the defense of impracticability is that the nonoccurrence of these events must have been a basic assumption on which the agreement was made. The Arbitrator acknowledged in his findings of fact that the JOA provided for decreases in the management fee due to decrease in circulation. (**Exhibit 1**, at 6 and n.3, citing JOA § J.4.(c) and (d)). In fact, footnote 3 of the Award noted that in mid-2010, the parties revised the LPA and the JOA when "it was clear that electronic news was taking the market share of print newspapers at a quickening pace." (Id.). Based on the fluctuating scale for the management fee and the other revisions in the LPA and the JOA in 2010,[11] it is clear that parties understood these risks and accounted for them accordingly.

Respondents are complaining about market forces and conditions that were well within the contemplation of the parties at the time of the revisions to the agreements in 2010. Comment b to 261 of the Restatement (Second) of Contracts explains, in part, that "[i]ts application is also simple enough in the cases of market shifts or the financial inability of one of the parties. The continuation of existing market conditions and of the financial situation of the parties are

---

[11]     While Respondents claim that the introduction of the i-Phone occurred in 2010, the reality is that the product was originally introduced in 2007. See Press Release, Apple Reinvents the Phone with iPhone, https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/ (last visited Sept. 26, 2017). Therefore, the parties were well aware of the impact of electronic media at that time.

ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section." Numerous courts considering impracticability defenses in light of economic downturns and changing marketing conditions have rejected impracticability as an excuse for non-performance. See, e.g., Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH, 867 F.3d 692, 702–04 (6th Cir. 2017) (citing several examples, including Karl Wendt Farm Equipment Co. v. International Harvester Co., 931 F.2d 1112, 1117 (6th Cir. 1991), where the court refused the impracticability defense when International Harvester (IH) "experienced a dramatic downturn in the farm equipment market under circumstances where IH was losing over two million dollars per day"; and Flathead-Michigan I, LLC v. Penninsula Dev., LLC, No. 09-14043, 2011 WL 940048, at *3–4 (E.D. Mich. Mar. 16, 2011), concluding that impracticability defense based on the economic downturn of 2008 did not excuse the defendant's performance because "[t]he state of the market is one of the things on which the parties are gambling when the contract ... is made.") (citations omitted)); Wagner & Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc., 539 F. Supp. 2d 461, 472 (D. Mass.), aff'd sub nom. Wagner and Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc., 547 F.3d 38 (1st Cir. 2008) ("Even assuming the truth of all of plaintiff's contentions about the decline of the Land Rover and Jaguar markets, economic downturns and market shifts are not the type of risks that are 'so unusual and have such severe consequences that they must have been beyond the assignment of risks inherent in the contract....'"); Ashraf v. Swire Pac. Holdings, Inc., 752 F. Supp. 2d 1266, 1270 (S.D. Fla. 2009) (rejecting 2008 crash in real estate market as basis of impossibility/impracticability); Elavon, Inc. v. Wachovia Bank, Nat. Ass'n, 841 F. Supp. 2d 1298, 1307 (N.D. Ga. 2011) ("the economic

downfall of 2008 was not a contingency 'the non-occurrence of which was a basic assumption on which the contract was made.'").[12]

Second, the Arbitrator determined that Petitioners were unable to perform the management services because Respondents unilaterally closed publication of the *Daily Mail*. (**Exhibit 1**, at 12). Though Respondents argue that it was impossible to continue both operations, it is clear that continued publication was objectively possible even if Respondents

---

[12]  See LSREF2 Baron, LLC v. Beemer & Assocs. XLVII, L.L.C., No. 3:10-CV-576-J-32JBT, 2011 WL 6838047, at *3 (M.D. Fla. Dec. 29, 2011), stating:

> First, an economic downturn, even one as drastic and severe as the recent recession, is not the type of unanticipated circumstance that would relieve sophisticated business entities from their contractual obligations. While the parties may not have thought a recession likely at the time they signed the agreements, the possibility of economic downturn should have reasonably been within their contemplation. See Ferguson, 54 So.3d at 556 ("Economic downturns and other market shifts do not truly constitute unanticipated circumstances in a market-based economy."); Flathead–Michigan I, LLC v. Peninsula Development, LLC, No. 09–14043, 2011 WL 940048 (E.D.Mich. March 16, 2011) ("[T]he continuation of existing market and of the financial situation of the parties are not ordinarily such [basic] assumptions, so that mere market shifts or financial ability do not usually effect discharge.") (quoting Rest.2d Contracts § 261, comment b); All Points Capital Corp. v. Boyd Brothers, Inc., 5:11–cv–116/RS–EMT, 2011 WL 2790170 (N.D.Fla.2011) (same). Second, "simple inability to pay does not create an impossibility or impracticality which excuses a party's performance of his contractual allegations." Bank of America, N.A. v. Shelbourne Development Group, Inc., No. 09–c–4963, 2011 WL 829390, at *5 (N.D.Ill. March 3, 2011) (quoting Days Inn of America, Inc. v. Patel, 88 F.Supp.2d 928, 933 (C.D.Ill.2000)); see also Hoosier Energy Rural Electric Co–Op, Inc. v. John Hancock Life Insurance Co., 582 F.3d 721 (7th Cir.2009) (" '[I]mpossibility' doctrine never justifies failure to make a payment, because financial distress differs from impossibility."); Karl Wendt Farm Equip. Co. v. Int'l Harvester Corp., 931 F.2d 1112, 1118 (6th Cir.1991) ("[N]either market shifts nor the financial inability of one of the parties changes the basic assumptions of the contract such that it may be excused under the doctrine of impracticability.").

and Gurwitz v. Mercantile/Image Press, Inc., No. 051887A, 2006 WL 1646144, at *2 (Mass. Super. May 15, 2006), stating:

> Here, the decline in the printing industry, while marked and unfortunate for Mercantile, was not the sort of unanticipated circumstance that falls within the purview of the doctrine of impossibility.
> Certainly, the climactic market change made it more difficult for Mercantile to perform its obligations under the Agreement, but economic downturns and other market shifts do not truly constitute unanticipated circumstances in a market-based economy. To find otherwise would extend the defense of impossibility to include any business that faces financial difficulty based on decreased demand for its products or services, and would allow businesses that have failed to anticipate or to protect themselves from market changes to avoid their obligations at the expense of innocent parties.

could no longer financially do so.  Under the test outlined in the <u>Restatement (Second) of</u> <u>Contracts</u> (Comment (e) to Section 261), the thing could still be done despite Respondents' claimed financial inability to do so. <u>See</u> *supra* footnote 10.

"Central to the application of the doctrine of impracticability is a determination that the party who seeks to be excused from performance was not at fault or had no control as to the nonoccurrence of the presupposed event upon which the contract depended." <u>Gaddy Eng'g Co.</u> <u>v. Bowles Rice McDavid Graff & Love, LLP</u>, 231 W. Va. 577, 583-84 (W. Va. 2013).  Here, the alleged impossibility of continuing to publish both newspapers was caused by Respondents' own conduct and was within Respondents' own control.  They voluntarily chose to close the *Daily Mail*.  In short, Respondents created the inability to perform; therefore, they cannot now use it as an excuse for nonperformance.  <u>See</u> <u>Waddy</u>, 216 W. Va. at 262 ("A party cannot by its own act place itself in a position to be unable to perform a contract, then plead that inability to perform as an excuse for nonperformance.") (citation omitted)).

Based on the foregoing, the Arbitrator was correct in rejecting Respondents' impossibility (impracticability) defense.  Accordingly, Respondents do not satisfy their burden of showing a "manifest disregard" for the law with respect to the defense of impracticability.

## IV.  <u>CONCLUSION</u>

In sum, Respondents have failed to satisfy their heavy burden to justify vacatur of the Award.  Respondents were provided the benefit their bargain under the Arbitration Agreement. The Arbitrator construed the parties' agreements, considered the defenses raised, and did his job in promulgating a reasoned award.  Respondents have not shown any basis for vacating the

Award under the FAA. Therefore, Petitioners respectfully request that the Court deny Respondents' Motion to Vacate.

## V.     **MOTION TO CONFIRM THE AWARD**

As this Court recently explained in Elkland Holdings LLC, 2015 WL 13037115, at *16, the Court "***must*** confirm an arbitration award unless the award is vacated, modified, or corrected. Id. (quoting 9 U.S.C. § 9) (emphasis added). "[C]onfirmation of an arbitration award is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court.' " Id. (quoting D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006)). Because Respondents' arguments in support of their Motion to Vacate are without merit, Petitioners respectfully request that the Court confirm the Award under section 9 of the FAA and enter a judgment in favor of Petitioners consistent with the Award.

                        **MediaNews Group, Inc. and Charleston Publishing Company**,

                        **Petitioners,**

                        By Counsel:

/s/ Thomas H. Ewing
Steven L. Thomas (WVSB #3738)
Thomas H. Ewing (WVSB #9655)
Courtney A. Kirtley (WVSB #9414)
Kay Casto & Chaney PLLC
P. O. Box 2031
Charleston, West Virginia 25327
(304) 345-8900 / telephone
(304) 345-8909 / fax
sthomas@kaycasto.com
*Counsel for Petitioners MediaNews Group, Inc.*
*and Charleston Publishing Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

MEDIANEWS GROUP, INC. and
CHARLESTON PUBLISHING
COMPANY,

        Petitioners,

v.                                  **Civil Action No. 2:17-cv-03921**
                                           **(Judge Johnston**)

DAILY GAZETTE COMPANY and
DAILY GAZETTE HOLDING
COMPANY, LLC,

        Respondents.

## CERTIFICATE OF SERVICE

I, Thomas H. Ewing, do hereby certify that on this 6th day of October, 2017, I have

electronically filed the foregoing *PETITIONERS' COMBINED (i) RESPONSE IN*

*OPPOSITION TO RESPONDENTS' MOTION TO VACATE ARBITRATOR'S AWARD*

*AND (ii) MEMORANDUM IN SUPPORT OF MOTION TO CONFIRM ARBITRATOR'S*

*AWARD* with the Clerk of the Court using the CM/ECF system, which will send notification of

such filing to the following CM/ECF participants:

                    Richard Neely
                    Neely & Callaghan
                    159 Summers Street, Suite 310
                    Charleston, WV  25301
                    rneely@neelycallaghan.com
                     *Counsel for Respondents*

                    /s/  Thomas H. Ewing
                    Thomas H. Ewing (WVSB #9655)