**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

MEDIANEWS GROUPS, INC. et al.,

                Plaintiffs,

v.                                   CIVIL ACTION NO.   2:17-cv-03921

DAILY GAZETTE COMPANY, et al.,

                Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Petitioners Charleston Publishing Company and MediaNews Group, Inc.'s Petition for Order Confirming Arbitration Award, (ECF No. 2), and Motion to Confirm Arbitrators Award, (ECF No 9).   Also pending before the Court is Respondents Daily Gazette Company and Daily Gazette Holding Company's Combined Motion to Vacate Arbitrator's Award.   (ECF No. 8).[1]   For reasons stated more fully below, Petitioners' petition to confirm the Arbitrator's award, (ECF No. 2), and motion to confirm the Arbitrator's award, (ECF No. 9), are **GRANTED**.   Respondents' motion to vacate the Arbitrator's award is **DENIED**.   (ECF No. 8.)

---

[1] Also pending before the Court are Petitioners' motion to confirm exemption from Rule 16 and Rule 26 requirements, (ECF No. 15), motion for a hearing on Respondents' motion to vacate the arbitration award, (ECF No. 15), and motion for expedited hearing to confirm arbitrators' award.   (ECF No. 17.)   As this memorandum opinion and order resolves the case, these motions are **DENIED AS MOOT**.

## I.      BACKGROUND

Petitioners, MediaNews Group, Inc. ("MediaNews") and Charleston Publishing Company ("CPC") are both Delaware corporations, with CPC being the wholly owned subsidiary of MediaNews.   (ECF No. 2 at ¶¶ 1–2.)   Respondent, Daily Gazette Company ("DGC"), is a West Virginia corporation and is also the sole member of Respondent Daily Gazette Holding Company, LLC ("DGHC").    (Id. at ¶¶ 3–4.)

In 2003, MediaNews received an offer to purchase the *Charleston Daily Mail* ("*Daily Mail*").   (ECF No. 2-1 at 5.)   Due to a previous agreement between MediaNews and DGC, DGC had a right to exercise a right of first refusal to purchase the *Daily Mail*.   (*Id.*)   DCG exercised this right and purchased the *Daily Mail*.   (*Id.*)   The purchase of the *Daily Mail* raised anti-trust issues with the U.S. Department of Justice ("DOJ") under The Newspaper Preservation Act ("NPA").   (*Id.*)   In order to comply with the NPA, MediaNews and DGC negotiated a sale of MediaNews' economic interest in the joint venture to own the *Daily Mail* to DGC.   (*Id.*)   Under the deal, MediaNews retained a reversionary interest in certain assets it contributed to the joint venture, including a reversionary interest in the URL "dailymail.com."   (*Id.*)   MediaNews was further given sole responsibility for the editorial content of the *Daily Mail* and would receive a management fee of $200,000 a year.   (*Id.*)   In order to manage this joint venture, MediaNews and DGC created Charleston Newspaper Holdings, L.P. ("CNH") through their subsidiaries, CPC and DGHC. (*Id.*)   CPC became the sole limited partner in CNH and DGHC became the sole general partner.   (ECF No. 2 at ¶¶ 2, 4.)   The limited partnership was to last until June 30, 2024.   (ECF No. 2-1 at 6.)

2

The DOJ challenged the joint venture and instituted an anti-trust lawsuit.   (*Id.* at 5.)   A consent decree in that lawsuit was entered on July 19, 2010.   (*Id.*)   As a result of the consent decree, on or about July 23, 2010, CPC and DGHC entered into an Amended and Restated Limited Partnership Agreement ("LPA") for CNH.   (ECF No. 2 at ¶ 9; ECF No. 2-1 at 6.)   On the same day, CPC, DGC, and DGHC entered into a Second Amended Restated Joint Operating Agreement ("the JOA").   (ECF No. 2 at ¶ 10.)   Part of the agreement raised MediaNews's annual management fee to $225,000.   (ECF No. 2-1 at 6.)   Most importantly to the present action, section VII(P) of the JOA incorporated Exhibit A, an attached Arbitration Agreement, into the JOA.   (ECF No. 2 at ¶ 13.)   The Arbitration Agreement set forth the procedures to be followed in the event that there is a dispute, claim, or controversy arising from the JOA, "or any course of conduct, course of dealings, statements (oral or written), or actions of any party related to the JOA, including any claim based on or arising from an alleged tort."   (*See* ECF No. 2-3 at Exhibit A.)   It further provided that the result of any arbitration will be binding on the parties and that any judgment on the Arbitrator's Award may be entered in a court designated in the Arbitration Agreement.   (ECF No. 2 at ¶ 15.)   None of the parties dispute the validity of the Arbitration Agreement.

A.  *Dispute that Led to the Arbitration*

On or about April 16, 2013, without CPC's approval, DGHC transferred registration for the URL "dailymail.com" from the *Daily Mail* to CNH.   (ECF No. 2-1 at 8.)   DGHC did not inform CPC that it was negotiating with the publisher of the *UK Daily Mail* newspaper for the sale of the URL.   (*Id.*)   In November of that same year, DGHC sold the website to the *UK*

*Daily Mail* publisher for $1.5 million without CPC's knowledge or consent.   (*Id.*)   CPC believed it was entitled to receive the URL at the end of the joint venture's duration.   (*Id.*)

In May 2015, DGC sought permission from CPC to combine the *Charleston Gazette* and the *Daily Mail*.   (*Id.*)   MediaNews responded that it would not give consent until DGC consulted with the DOJ.   (*Id.*)   DGC notified the DOJ of its intent to consolidate and stop publishing the *Daily Mail* as an independent newspaper, but implemented the consolidation unilaterally without discussion with the DOJ or CPC's consent.   (*Id.*)   On July 20, 2015, CNH implemented the consolidation and stopped publishing the *Daily Mail*.   (*Id.*)   At that point, MediaNews and CPC were owed $495,000 in unpaid management fees.   (*Id.*)

A dispute arose between the parties with MediaNews and its subsidiary claiming breaches of the LPA and JOA as well as breaches of fiduciary duty and civil conspiracy by Respondents.   (ECF No. 2 at ¶ 17.)   Specifically, Petitioners asked for (1) $495,000 in overdue management fees, (2) approximately $1.8 million of future annual fees due through the end of the joint venture in 2024 because Petitioners alleged they were unilaterally and wrongfully terminated, and (3) $1.5 million, the price at which Respondents sold the URL "dailymail.com." (ECF No. 2-1 at 4, 9.)

Respondents argued that Petitioners wanted out of ownership of the *Daily Mail* in 2004; that anything agreed to in the LPA and JOA from 2004 and 2010 were to satisfy the DOJ; that Respondents had a right to substitute a new URL for "dailymail.com" as collateral for Respondents' loan with United Bank; that the Petitioners did nothing to earn their management fees; that the Petitioners did not act in good faith by bringing their action because they knew

Respondents did not have the means to pay any award; and that, in the current market, publishing two papers in Charleston, West Virginia was not economically feasible.   (*Id.* at 9.)

Pursuant to the Arbitration Agreement, the parties submitted the dispute to an Arbitrator, Edward D. McDevitt ("the Arbitrator").   (ECF No. 2 at ¶ 18.)   On April 12, 2017, the Arbitrator held a full and final hearing on the claims, after which a prepared transcript and post-hearing briefs from both parties was submitted.   (*Id.*)   On August 28, 2017, the Arbitrator entered an award in favor of Petitioners, finding that Respondents' arguments were legally insufficient to defeat Petitioners' claims.   (*Id.* at ¶ 19; ECF No. 2-1 at 10–17.)   The Arbitrator awarded Petitioners the amount stated in their claims plus interest.   (*Id.* at 16.)

### B.  Present Motions

On September 5, 2017, Petitioners submitted a petition to this Court to confirm the arbitration award in accordance with a provision in the Arbitration Agreement that allows the parties to ask that any arbitration award be entered in a court designated in the agreement.[2] (ECF No. 2.)   Respondents filed a motion to vacate the arbitration award arguing that the Arbitrator made significant errors of law that led him to "a judgment that was contrary to the law of West Virginia and completely inequitable."   (ECF No. 8 at 2.)   Petitioners filed a combined response and motion to confirm the arbitration award. (ECF No. 9.)   Respondents timely responded to Petitioners' motion.   Petitioners and Respondents both filed timely replies.   The petition and motions are now ripe for review.

---

[2] The Arbitration Agreement designates any United States Federal Court or West Virginia State Court sitting in Charleston, WV.   (*See* ECF No. 2 at ¶ 8.)   Therefore, this Court is designated under the Arbitration Agreement.

## II.     STANDARD OF REVIEW

"[J]udicial review of an arbitration award in federal court is 'severely circumscribed' and 'among the narrowest known at law.'"   *Jones v. Dancel*, 792 F.3d 395, 401 (4th Cir. 2015) (quoting *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 478 (4th Cir. 2012)); *see also PNGI Charles Town Gaming, LLC v. Mawing*, 603 F. App'x 137, 137–38 (4th Cir. 2015) ("In fact, 'the scope of judicial review for an Arbitrator's decision is among the narrowest of law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all . . . .'"(citation omitted)).   The Supreme Court has held that a court "must" confirm an arbitration award "unless" a party to the arbitration shows that the award should be vacated under Section 10 of he Federal Arbitration Act ("FAA").   *See Hall Street Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582 (2008) [hereinafter *Hall*].   Pursuant to section 10 of the FAA", an arbitration award can only be vacated on the following four grounds:

> (1) when the award was procured by corruption, fraud, or undue means; (2) when there was evident partiality or corruption on the part of an Arbitrator; (3) when an Arbitrator was guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior causing prejudice to the rights of any party; or (4) when an Arbitrator exceeded his or her powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10.   Additionally, the Fourth Circuit has held that "an arbitration award may be vacated when the Arbitrator 'manifestly disregards' the law."   *Jones*, 792 F.3d at 401 (citing *Wachovia Sec., LLC*, 671 F.3d at 483).

## III.     ANALYSIS

In their motion to vacate, Respondents argue that the arbitration at the subject of this action is not governed by the severe limitations of the FAA, but instead is governed by the

private contract between the parties.  (ECF No 8 at 2.)  Respondents further argue that the Arbitrator made legal errors with regards to his finding on the selling of the URL and Respondents' defense of impossibility.  (*Id.* at 2–11.)

### A.  FAA Standard of Review

Respondents assert that the FAA was meant to provide a procedure for parties that do not have a private arbitration contract, unlike in the present case.  (ECF No. 11 at 3.)  Therefore, Respondents argue, the provision in the JOA which allows the parties the right to seek vacation or modification of an arbitration award should govern the standard of review in the present action.  (*Id.* at 5.)  In support of their argument, Respondents rely solely on case law holding that parties are generally free in structuring their private dispute resolution agreements.  (*See id.* at 2.)

In their response and in their motion to affirm, Petitioners argue that the present arbitration award does fall under the FAA.  (ECF No. 10 at 6.)  Petitioners further argue that even if the arbitration clause in the JOA was intended to expand the scope of judicial review for an arbitration award beyond what is allowed under the FAA, the Supreme Court has held that a private contract cannot expand the scope of judicial review because that is exclusively governed by the FAA.  (*Id.* at 7.)  Lastly, Petitioners assert that to the extent that Respondents argue that the Arbitrator materially disregarded the law, Respondents are incorrect and simply disagree with the Arbitrator's findings.  (*Id.* at 8.)

In *Hall Street Associates, LLC v. Mattel, Inc.*, the Supreme Court resolved the Court of Appeals split over the exclusiveness of the FAA grounds for vacating an arbitration award.  *See Hall*, 552 U.S. at 583.  The petitioner seeking to vacate the arbitration award in that case argued

7

that the clause in the parties' agreement to review for legal errors should be the standard of review used because "arbitration is a creature of contract." *Id.* at 585. The Supreme Court, however, found that petitioner's argument "came up short," stating, "to rest this case on the general policy of treating arbitration agreements as enforceable as such would be to beg the question, which is whether the FAA has textual features at odds with enforcing a contract to expand judicial review following the arbitration." *Id.* at 586. The Court went on to hold that the categories in Section 10 of the FAA are exclusive on the scope of judicial review of arbitration contracts, stating the following:

> [E]xpanding the detailed categories would rub too much against the grain of the § 9 language, where provision for judicial confirmation carries no hint of flexibility. On application for an order confirming the arbitration award, the court "must grant" the order "unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." There is nothing malleable about "must grant," which unequivocally tells courts to grant confirmation in all cases, except when one of the "prescribed" exceptions applies. This does not sound remotely like a provision meant to tell a court what to do just in case the parties say nothing else.

*Id.* at 587 (quoting 9 U.S.C. § 9).

Here, Respondents offer a similar argument to the petitioner in the *Hall* case, in that Respondents assert that the judicial standard of review terms of their private arbitration contract act to expand the scope of judicial review under the FAA. However, in the *Hall* case, the Supreme Court clearly held contrary to Respondents' assertion. Accordingly, this Court **FINDS** that the present arbitration contract falls under the FAA. Therefore, in order for this Court to vacate the arbitration award, Respondents must allege that there has been a violation under Section 10 of the FAA or the "manifest disregard" standard set forth by the Fourth Circuit.

To that end, Respondents have not asserted that the arbitration award should be vacated for any of the grounds enumerated in section 10 of the FAA.   Respondents simply assert that the selling of the URL was contemplated in the contract and that they should not have been required to perform due to the doctrine of impossibility.   Neither of these assertions fall under any of the four categories for vacating an arbitration award under Section 10.   Therefore, this Court **FINDS** that the arbitration award should not be vacated pursuant to the four enumerated grounds in FAA.

### B.  Manifest Disregard

Respondents assert that the term "manifest disregard" is "absurd" and that any disregard of the law, however plain, is clearly manifested.   (ECF No. 11 at 5.)   Thus, Respondents argue, because any disregard of the law is "manifest" any disregard is also reviewable under the manifest disregard standard.   (*Id.* at 6.)   Respondents further argue that the Arbitrator's finding that the contract was unambiguous as to the sale of the URL constituting a breach of contract and that the doctrine of impossibility did not apply to Respondents' performance under the contract constituted "clear legal error" that was "clearly manifested."   (*Id.*)   Specifically, regarding the selling of the URL, Respondents argue that the contract was ambiguous as to the URL and, therefore, parol evidence should have been reviewed to interpret the contract in accordance with the parties' intentions, which, Respondents assert, shows that the selling of the URL was within contemplation of the JOA.   (ECF No. 8 at 3.)   Regarding the doctrine of impossibility, Respondents argue that the Arbitrator should have found that Respondents were allowed to unilaterally cease publication of the *Daily Mail* and stop paying Petitioners' management fees because to do otherwise would have caused Respondents to go bankrupt.   (*See id.* at 10–11.)

The Fourth Circuit has held that "[a] court may vacate an arbitration award under the manifest disregard standard only when a plaintiff has shown that:  (1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the Arbitrator refused to apply that legal principle." *Jones*, 792 F.3d at 402.  However, this "manifest disregard standard is not an 'invitation to review the merits of the underlying arbitration,' or to establish that the Arbitrator 'misconstrued' or 'misinterpreted the applicable law.'"  *Id.* (quoting *Wachovia Sec., LLC*, 671 F.2d at 478 n. 5, 481).

Here, Respondents' argument with regard to the meaning of "manifest disregard" toes the line of absurdity.   The Fourth Circuit has clearly stated that the manifest disregard standard of review is not the equivalent of reviewing an Arbitrator's decision for misconstruction or misinterpretation of applicable law.  *See Jones*, 792 F.3d at 403.   Thus, it is clear that the Fourth Circuit intended for manifest disregard to be narrower than review for *any* legal error. Accordingly, the Court does not accept Respondents' argument that the Arbitrator committed "clear legal error" which is reviewable under the manifest disregard standard.

Furthermore, Respondents, who bear the burden of showing that the Arbitrator manifestly disregarded the law, only assert that the Arbitrator made "significant errors of law" and challenge the Arbitrator's interpretation of applicable law.   (ECF No. 8 at 2.)   Respondents do not assert, nor does the Court find, that the Arbitrator "refuse[d] to heed any clearly defined legal principles."   *See Jones*, 792 F.3d at 404.   In reviewing the sale of the URL, the Arbitrator used basic contract interpretation principles to determine that the contract was unambiguous as to the sale of the URL and Petitioners' right of reverter in the URL.   (*See* ECF No. 2-1 at 10–12.) The fact that Respondents disagree with the Arbitrator's ruling that the contract was

unambiguous does not constitute a finding that the Arbitrator refused to apply West Virginia contract interpretation principles.

  In reviewing the Respondents' argument that they should be excused from performing under the contract because doing so would have cause them to go bankrupt, the Arbitrator held that the JOA made it clear that Respondents could not unilaterally discontinue publication or discontinue the payment of Petitioners' fees unless certain conditions were met. (*See id.* at 14–15.) The Arbitrator further found that these conditions were not met in the present case.[3] (*See id.*) Although the Arbitrator does not directly discuss the doctrine of impossibility, the Arbitrator did acknowledge that Respondents' position was sympathetic and pointed to the fact that the contract provided for the possibility of decreased circulation, which weighs against one of the four factors for the defense of impossibility.[4] (*See id.*) Thus, again, it cannot be said that the Arbitrator refused to apply applicable law. Accordingly, this court **FINDS** that Respondents have failed to satisfy their burden of showing that the Arbitrator manifestly disregarded the law.

---

[3]  The Arbitrator stated that the JOA clearly prohibited the joint venture from discontinuing publication of the *Daily Mail* without CPC's permission unless the following occurred:

> (i) the incremental revenue from Mail fails to cover Mail's incremental costs and the discontinuation of Mail can be effected by satisfying the failing firm test as applicable to joint operating agreement newspapers under the [Newspaper Preservation] Act and (ii) the U.S. Department of Justice approves the discontinuation of publication of Mail.

(ECF No. 2-11 at 14 (citing Claimants Post-Hearing Brief at 3).)

[4]  In *Waddy v. Riggleman*, the Supreme Court of Appeals of West Virginia adopted section 261 of Restatement (Second) of Contract, which outlines the factors for the defense of impossibility.   606 S.E.2d 222, 231–35(W. Va. 2004).   The four factors are as follows:

> (1) The event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed, either expressly or impliedly, to perform in spite of the impracticability that would otherwise justify his nonperformance.

*Id.*   The fact that the parties provided for circulation decreases tends to show that the occurrence of the decreased circulation was a basic assumption on which the contract was made.

*IV.      CONCLUSION*

For the foregoing reasons, this Court **GRANTS** Petitioners' petition, (ECF No. 2), and motion to confirm the arbitration award, (ECF No. 9).   This Court further **DENIES** Respondents' motion to vacate the arbitration award.   (ECF No. 8.)   The Court **DIRECTS** the Clerk to remove this case from the Court's docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:        January 19, 2018

THOMAS E. JOHNSTON, CHIEF JUDGE